IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ELECTRONIC FRONTIER FOUNDATION** | ) |
| 815 Eddy Street | ) |
| San Francisco, CA 94109, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| **DEPARTMENT OF COMMERCE** | ) |
| 1401 Constitution Avenue, N.W. | ) |
| Washington, DC 20230, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| **DEPARTMENT OF JUSTICE** | ) |
| 950 Pennsylvania Avenue, N.W. | ) |
| Washington, DC 20530, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| **DEPARTMENT OF HOMELAND SECURITY** | ) |
| 245 Murray Lane, S.W. | ) |
| Washington, DC 20528, | ) |
| | ) |
| Defendant. | ) |

**COMPLAINT FOR INJUNCTIVE RELIEF**

1. This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. Sec. 552, for injunctive and other appropriate relief. Plaintiff seeks the expedited processing and release of records that Plaintiff requested from Defendants Department of Commerce, Department of Justice, and Department of Homeland Security concerning the agencies' creation, participation, and support of the federal Tattoo Recognition Technology program.

**PARTIES**

2. Plaintiff Electronic Frontier Foundation (EFF) is a not-for-profit corporation established under the laws of the State of California, with offices in San Francisco, California and Washington, DC. EFF is a donor-supported membership organization that works to inform policymakers and the general public about civil liberties issues related to technology, and to act as a defender of those liberties. In support of its mission, EFF uses the FOIA to obtain and disseminate information concerning the activities of federal agencies.

3. Defendant Department of Commerce (DOC) is a Department of the Executive Branch of the United States Government. DOC is an "agency" within the meaning of 5 U.S.C. § 552(f). The National Institute of Standards and Technology (NIST) is a component of Defendant DOC.

4. Defendant Department of Justice (DOJ) is a Department of the Executive Branch of the United States Government. DOJ is an "agency" within the meaning of 5 U.S.C. § 552(f). The Federal Bureau of Investigation (FBI) is a component of Defendant DOJ.

5. Defendant Department of Homeland Security (DHS) is a Department of the Executive Branch of the United States Government. DHS is an "agency" within the meaning of 5 U.S.C. § 552(f).

**JURISDICTION AND VENUE**

6. This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. §§ 552(a)(4)(B) and 552(a)(6)(C)(i). This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

7. Venue is proper in this district under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e).

## BACKGROUND

### A. Law Enforcement Efforts to Build an Automated Tattoo Recognition Tool Raise Civil Liberties and Ethical Concerns.

8. Defendants are developing technology for police to rapidly scan anyone's tattoos and make a myriad of assumptions about them, including falsely associating them with criminal activity. Although law enforcement have in the past used pictures of tattoos to identify criminal suspects and victims, Defendants are working to create and promote the development of automated tattoo recognition tools that would go far beyond that technique. NIST is working in conjunction with the FBI, DHS, public universities, private industry, and state and local law enforcement to develop a series of algorithms that would detect tattoos on people's skin, identify them by their tattoos, match them with others who have similar tattoos, and flag them as being similar to prominent religious, ethnic, and expressive symbols.[1]

9. The government's efforts raise profound religious, expressive, and privacy concerns. Moreover, the limited information EFF has already obtained about the program revealed a range of potentially unethical behavior, including conducting research on prisoners without approval, much less adequate oversight and appropriate safeguards. Through its FOIA requests and this lawsuit, EFF seeks to uncover more information about this controversial program and to inform the public about the government's efforts to create automated tattoo recognition technology.

### B. Tattoos Have a Long History as Symbols of Expression and Belief.

10. For thousands of years tattoos have served as an expression of the self and one's beliefs: "These permanent designs – sometimes plain, sometimes elaborate, always personal – have served as amulets, status symbols, declarations of love, signs of religious beliefs,

---

[1] Aaron Mackey, Dave Maass, & Soraya Okuda, *Five Ways Law Enforcement Will Use Tattoo Recognition Technology*, EFF DEEPLINKS (June 2, 2016), https://www.eff.org/deeplinks/2016/05/5-ways-law-enforcement-will-use-tattoo-recognition-technology.

adornments and even forms of punishment."[2] Archeology's famous "Iceman," a 5,200 year-old mummy preserved in snow along the Italian-Austrian border, was tattooed with dots and small crosses believed to have once been administered to alleviate joint pain, and influential Egyptian women may have been tattooed as an amulet against the dangers of childbirth.[3]

11.   In *Four Indian Kings*, painted in 1710, the King of the Maquas (Mohawk, native to Upstate New York and Canada) is depicted with black lines of tattoos covering his chest and lower face.[4] Native American tattoos depicted in early exploration of the United States represent military conquests and protective spirits – and many tribes across the Americas and their descendants carry on this practice today.[5]

12.   Eighteenth century European sailors began tattooing their arms and chests to mark their ships, famous voyages, and the crossing of the Equator, drawing from practices witnessed in Polynesia.[6] Soon after, tattoos became popular in port cities and spread to the point that England's King Edward VII got a tattoo in 1862 in Jerusalem, and his sons Prince Albert and the future King George V received dragons from the widely-regarded Japanese artist Hori Chyo.[7]

13.   Tattoos are used as artistic representations of an individual's innermost thoughts, closely-held beliefs, and significant moments. Traditions for tattoo artistry are not limited to a particular sex, race, culture, religion, economic status, or country of origin. Tattoos have been and remain speech, thought, and art.

### C. Federal Tattoo Recognition Programs are Designed to Track Free Speech.

14.   Seizing on the highly expressive nature of tattoos and their links to historic, cultural, religious, and other iconography and shared meaning, federal researchers have begun developing

---

[2] Cate Lineberry, *Tattoos: The Ancient and Mysterious History*, SMITHSONIAN (Jan. 1, 2001), https://www.smithsonianmag.com/history/tattoos-144038580/.
[3] *Id.*
[4] Olivia B. Waxman, *See Rare Images From the Early History of Tattoos in America*, TIME (Feb. 28, 2017), http://time.com/4645964/tattoo-history/.
[5] *Id.*
[6] *Id.*
[7] *Id.*

algorithmic recognition technology to "crack the code" of tattoos and speech. This raises serious concerns for the First Amendment – tracking tattoos disadvantages them as a form of free speech and also creates freedom of association concerns when people are matched with others for government surveillance and investigative purposes, sometimes incorrectly.[8] What makes tattoos unique compared to other biometric identifiers is that they are elective – individuals choose to put tattoos on their bodies to express themselves, in both visible and non-visible locations.

15. Defendants have created a program to research tattoo recognition algorithms and their effectiveness without the consent of persons studied and without regard to their First Amendment rights.

16. In 2014, NIST began an initiative to refine automated tattoo recognition technology, the Tattoo Recognition Technology program, with sponsorship from the FBI's Biometric Center for Excellence.[9] In addition to research in using tattoos as tools for identity-verification, NIST began programs to map the connections between individuals, their tattoos, and individuals with similar tattoos to make inferences about their connection and predict ideological affiliations. Many of these experiments were based on categorizing tattoos depicting Christian and other religious iconography, and could easily be applied to group and track people based on issues as sensitive as sexual identity, the participation in political campaigns, and grassroots movements.

17. NIST's first major publically announced tattoo project was the Tattoo Recognition Technology Challenge – what it called Tatt-C – which allowed private institutions and public universities to access a database of 15,000 pictures of tattoos and other images, supplied in part

---

[8] In the immigration context, there are a number of stories of Mexican, Central, and South American immigrants who were raised in the United States and married to U.S. citizens but who are denied reentry into the U.S. because their tattoos are deemed gang affiliated. In the case of Hector Villalobos, his theater mask tattoos, while a common symbol, were incorrectly identified as gang affiliated. Miriam Jordan, *Tattoo Checks Trip Up Visas*, THE WALL STREET JOURNAL (July 11, 2012), https://finance.yahoo.com/news/tattoo-checks-trip-up-visas.html.
[9] NAT'L INST. FOR STAN. AND TECH., *Tattoo Recognition Technology* (May 8, 2014), https://www.nist.gov/programs-projects/tattoo-recognition-technology (last visited Nov. 29, 2017).

by the FBI, to perform algorithmic experiments.[10] Five research institutions, six universities, and eight private companies signed up for this challenge and accessed this dataset. To gain access, these entities filed an initial request with NIST and submitted a follow-up form to the FBI. Once the FBI approved the entity to join the program, officials then mailed the dataset to the participants on a CD-Rom.[11]

18. One participant in the Tatt-C program, Purdue University, has also paired with DHS in another program for the mobile recognition of both graffiti and tattoos called Gang Graffiti Automatic Recognition and Interpretation (GARI).[12] DHS has recommended that GARI be used at the U.S. border for intelligence and enforcement purposes, and the Indianapolis Police have endorsed GARI saying, "I'm really excited about the possibility of using it with the prison population to identify tattoos. Tattoos are more specific because you can identify an actual person."[13]

19. In March 2016, NIST began a subsequent tattoo recognition challenge – Tattoo Recognition Technology Evaluation, or Tatt-E – which is designed to improve the accuracy of tattoo recognition as well as identify patterns in subsections of tattoos.[14] Participants can submit algorithms to the challenge to test against a much larger database of 100,000 tattoos and other photographs supplied by the Pinellas County Sheriff's Department in Florida, the Michigan State

---

[10] The dataset of 15,000 images is not entirely comprised of tattoo photographs. To "train" an algorithm, researchers supply non-matching data so that the program can better distinguish matching data. NAT'L INST. FOR STAN. AND TECH., *Tattoo Recognition Technology-Challenge (Tatt-C)* (July 17, 2014), https://www.nist.gov/programs-projects/tattoo-recognition-technology-challenge-tatt-c (last visited Nov. 29, 2017).

[11] Researchers can now email tatt-e@nist.gov to access the Tatt-C dataset. *Id*.

[12] DEPT. OF HOMELAND SEC., ENHANCING COMMUNITY SAFETY: GANG GRAFFITI AUTOMATIC RECOGNITION AND INTERPRETATION SYSTEM, *available* at https://www.dhs.gov/sites/default/files/publications/Enhancing%20Community%20Safety-Gang%20Graffiti%20Automatic%20Recognition%20and%20Interpretation%20System-GARI-Jan2014_2.pdf.

[13] *Id*.

[14] NAT'L INST. FOR STAN. AND TECH., *Tattoo Recognition Technology-Evaluation (Tatt-E)* (Mar. 10, 2016), https://www.nist.gov/programs-projects/tattoo-recognition-technology-evaluation-tatt-e (last visited Nov. 29, 2017).

Police, and the Tennessee Department of Corrections.[15] During the spring and summer of 2017, participants in the Tatt-E program finalized and submitted their algorithms and research to NIST to publish the results of the challenge.[16]

20. These developments are particularly concerning because law enforcement are already using people's tattoos to potentially falsely associate them with criminal activity. For example, Defendant DHS earlier this year began deportation proceedings against a 23-year-old man enrolled in the Deferred Action for Childhood Arrivals (DACA) program based in large part on the fact that he has a tattoo that they associate with gang activity.[17] These types of false associations have led an increasing number of people to remove their tattoos.[18] Further, just because a tattoo may be currently associated with criminal activity does not mean that the owner intended such association,[19] and individuals who have renounced former criminal activity may still carry criminally affiliated tattoos because removal is time-intensive, painful, expensive, and highly dependent on individual beliefs.[20]

---

[15] Aaron Mackey and Dave Maass, *Tattoo Recognition Research Threatens Free Speech and Privacy*, EFF DEEPLINKS (June 2, 2016), https://www.eff.org/deeplinks/2016/06/tattoo-recognition-research-threatens-free-speech-and-privacy.

[16] *Supra*, note 14.

[17] Nina Shapiro, *Do feds have evidence that detained Dreamer is a gang member beyond tattoo?*, SEATTLE TIMES (Feb. 15, 2017), https://www.seattletimes.com/seattle-news/feds-says-detained-dreamer-is-gang-member-lawyer-denies-it/; Suzanne Gamboa, *Was It Legal for ICE to Arrest Young Immigrant with DACA Status?*, NBC NEWS (Feb. 15, 2017), https://www.nbcnews.com/news/latino/was-it-legal-ice-arrest-young-immigrant-daca-status-n721261.

[18] *Tattoo Removal Business Booming As Fears For Deportation Mount*, CBS SF BAY AREA (March 18, 2017), http://sanfrancisco.cbslocal.com/2017/03/18/tattoo-removal-business-booming-as-fears-of-deportation-mount/.

[19] Cecilia Saixue Watt, *Are these clowns really gang members? Juggalos protest FBI's label*, THE GUARDIAN (Sept. 11, 2017), https://www.theguardian.com/music/2017/sep/11/juggalos-protest-fbi-label-gang-report-insane-clown-posse.

[20] Victoria St. Martin, *Former gang members remove tattoos to break from past*, THE WASHINGTON POST (July 10, 2015), https://www.washingtonpost.com/local/gang-members-remove-tattoos-to-break-from-past/2015/07/10/3bd54ae8-266d-11e5-b72c-2b7d516e1e0e_story.html?utm_term=.8da0e18385be.

### D. NIST's Automated Tattoo Recognition Research Did Not Follow Ethical Standards for Performing Research on Human Subjects and Prisoners.

21. The dataset provided to research institutions by the FBI and NIST through the Tatt-C challenge was largely collected from prisoners without their knowledge or consent for the research. Documents released to EFF in a partial FOIA productions show that government officials handed over these images to third-parties with little restriction on how they could be used or shared.[21] Many of the images reviewed by Plaintiff contained personally identifying information, including people's names, faces, and birth dates, and did not contain privacy protections.[22]

22. EFF's investigation showed that NIST also failed to follow ethical standards in creating the Tatt-C program and sharing these prisoners' photos with third parties. According to U.S. Health and Human Services policy for all federal agency research involving human subjects, researchers must receive approval from an Institutional Review Board prior to any human-subjects research. *The Common Rule,* 45 C.F.R. § 46. Data that is public or stripped of identifying information may be exempt from this review process, except for when the research is based on prisoners because it is acknowledged that prisoners are a uniquely vulnerable population. 45 C.F.R. § 46.101, footnote 1. Instead, NIST researchers did not inquire about the ethical standards of the research until *after* the Tatt-C program had begun and did not tell their supervisors that the data set included photographs of prisoners.[23]

23. A NIST supervisor retroactively determined that the research did not include human subjects;[24] however, the data set includes photographs of human bodies; some of the tattoos themselves include personal information, such as birthdates and names; and the research intends, in part, to identify individuals based on their tattoos.

---

[21] *Supra*, note 15.
[22] *Id*.
[23] *Id*.
[24] NIST PRODUCTION, DETERMINATION FOR ITL PROJECT # ITL-0002, ENTITLED, 'TATTOO RECOGNITION TECHNOLOGY RESEARCH AND EVALUATIONS WITH FEDERAL BUREAU OF INVESTIGATION (FBI) OPERATIONALLY COLLECTED TATTOO DATA' (Apr. 10, 2015), *available* at https://www.eff.org/document/nist-tattoo-recognition-foia.

24. Additionally, the photographs supplied by the FBI for the tattoo recognition dataset were presumably obtained from arrest and imprisonment procedures, and may be able to be linked to specific individuals and criminal records. The FBI's methodology in selecting photographs for this program raises additional ethical questions, including the extent of FBI involvement in the research and whether FBI personnel could be considered "investigators" for human-subjects research purposes.

25. The fact that NIST researchers, the FBI, and downstream institutions who partnered with NIST and used the Tatt-C dataset, did not properly follow human subjects research rules was discovered in a partial production in response to Plaintiff's FOIA requests. Plaintiff believes that a complete response to our request will shine a spotlight on how the U.S. government treats artistic speech, expression, and assembly as well as protocols for research involving prisoners.

**EFF'S FOIA REQUESTS**

A.   **EFF FOIA Request NIST 2016-000922**

26. In an email dated April 8, 2016, Plaintiff filed a FOIA request with NIST for records describing the creation and administration of the Tattoo Recognition Technology Program (April 8 FOIA).

27. Specifically, the request sought:
- documents describing the ethical standard and administrative process used for human subjects research in the creation of the Tattoo Recognition Technology program,
- a list of entities who received tattoos datasets from NIST during the Tatt-C challenge,
- correspondence between NIST and the FBI regarding the Tatt-C and Tatt-E datasets, and
- NIST presentations on tattoo recognition described on the Tatt-C website.

28. Plaintiff's April 8 FOIA sought expedited processing of the request and also

9

formally requested that it not be charged search or review fees for its request because EFF qualifies as a representative of the news media pursuant to the FOIA and 15 C.F.R. §§ 4.6(f), 4.11(b)(6). Plaintiff further requested that it be granted a waiver of all fees related to its request because disclosure of the requested information is in the public interest within the meaning of 5 U.S.C. § 552(a)(4)(A)(iii) and 15 C.F.R. § 4.11(l).

29.     By letter dated April 15, 2016, NIST acknowledged receipt of the April 8 FOIA. On April 27, 2016, NIST granted Plaintiff's request for a waiver of all fees and agreed to expedite processing of the request.

30.     By letter dated May 4, 2016, NIST provided an interim response to Plaintiff, identifying six agency records totaling seventy-seven pages that it released in full. The interim response indicated that NIST was continuing to process and review additional records responsive to Plaintiff's April 8 FOIA.

31.     On August 10, 2016 NIST provided its final response to the April 8 FOIA. NIST identified five agency records totaling 180 pages responsive to this request and released 144 pages in full. The remaining pages were withheld in full and in part under FOIA Exemptions 4, 6, 7(A), 7(B), 7(C), and 7(F) of 5 U.S.C. § 552(b).

32.     On August 10, 2016, NIST also identified eight other records totaling 142 pages that were referred to other agencies. NIST referred 117 pages to the FBI, a component of Defendant DOJ, and 25 pages to Defendant DHS.

33.     On September 8, 2016, Plaintiff filed an administrative appeal with the Department of Commerce challenging NIST's withholdings under Exemptions 4, 7(A), 7(B), and 7(F), as well as its failure to properly segregate exempt records. Plaintiff did not challenge NIST's withholdings under Exemptions 6 and 7(C).

34.     Plaintiff's administrative appeal also challenged NIST's decision to refer responsive records to Defendants DHS and the DOJ's component, FBI.

35.     On October 27, 2016, Plaintiff emailed Defendant DOC to confirm receipt of Plaintiff's September 8 administrative appeal. DOC stated, "Your appeal has been received and

reviewed and is in the queue behind some others that were filed before EFF's."

36. On April 4, 2017, Plaintiff emailed Defendant DOC to check the status of its administrative appeal. No response was received.

37. To date, Defendant DOC has not responded in substance to Plaintiff's administrative appeal.

38. To date, neither Defendant DHS nor Defendant DOJ's component FBI have responded in substance to the requested records referred to both agencies by NIST.

39. Plaintiff has exhausted the applicable administrative remedies with respect to its April 8 FOIA.

40. Defendants DOC, DOJ, and DHS have wrongfully withheld the requested records from Plaintiff.

**B. EFF FOIA Request NIST 2016-001340**

41. In an email dated June 22, 2016, Plaintiff filed a FOIA request with NIST, a component of Defendant DOC, referencing Plaintiff's earlier request (NIST 2016-000922) and requesting additional records relating to the Tattoo Recognition Technology program (June 22 FOIA).

42. Specifically, Plaintiff's June 22 FOIA sought:

- all documentation of ethical oversight of tattoo research, including materials sent to the Human Subjects Review group and the Human Subjects Protection Office,
- records identifying entities and individuals who received the Tatt-C dataset,
- correspondence between FBI and NIST about the creation of Tatt-C dataset,
- processing noted for EFF's earlier FOIA request NIST 2016-000922,
- NIST emails referencing EFF or Dave Maass,
- emails sent and received by tattoo_comment@nist.gov, and
- all communications between NIST and Health and Human Services about

11

human subjects review of tattoo recognition research.

43. Plaintiff's June 22 FOIA requested expedited processing of its request pursuant to 5 U.S.C. § 552(a)(6)(E) and 15 C.F.R. Sec. 4.6(f). It also sought "news media" fee status and a public interest waiver of all processing fees pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) and 15 C.F.R. §§ 4.11(b)(6), (l).

44. On June 24, 2016, NIST acknowledged receipt of Plaintiff's June 22 FOIA request by letter. The letter did not mention any determination with regard to Plaintiff's requests for expedited processing, to be treated as a "news media" requester, or for a waiver of all processing fees.

45. On September 8, 2016, EFF filed an administrative appeal with Defendant DOC arguing that NIST failed to timely process and respond to the June 22 FOIA Request within FOIA's statutory deadline.

46. To date, Defendant DOC has not responded in substance to Plaintiff's initial request, nor its administrative appeal.

47. Plaintiff has exhausted the applicable administrative remedies with respect to its June 22 FOIA.

48. Defendant has wrongfully withheld the requested records from Plaintiff.

**C. EFF FOIA Request NIST 2017-001137**

49. In an email dated May 2, 2017, Plaintiff filed a FOIA Request with NIST, a component of Defendant DOC, requesting all applications and agreements to participate in NIST's Tatt-E testing program along with all emails sent and received by tatt-e@nist.gov (May 2 FOIA).

50. Plaintiff's May 2 FOIA requested expedited processing of its request pursuant to 5 U.S.C. Sec. 552(a)(6)(E) and 15 C.F.R. Sec. 4.6(f). The request also sought "news media" fee status and a public interest waiver of all processing fees pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) and 15 C.F.R. §§ 4.11(b)(6), (l).

51. On May 5, 2017, NIST acknowledged receipt of Plaintiff's May 2 FOIA by letter.

52. By letter dated May 16, 2017, NIST provided a status update to Plaintiff's May 2 FOIA. The letter stated that NIST determined that Plaintiff is a media requester and, as a result, would not be charged duplication fees for the first 100 pages of responsive records. The letter did not make any determination regarding Plaintiff's request for a waiver of all fees or expedited processing of the request.

53. By letter dated July 3, 2017, NIST provided an interim response to Plaintiff, releasing in full two emails consisting of three pages from NIST employee Mei Lee Ngan to tatt-e@nist.gov regarding a Tatt-E evaluation test and the Tatt-E Phase 1 submission deadline.

54. To date, Defendant DOC has not responded to Plaintiff's initial request beyond its July 3 interim response.

55. Plaintiff has exhausted the applicable administrative remedies with respect to its May 2 FOIA.

56. Defendant has wrongfully withheld the requested records from Plaintiff.

**CAUSES OF ACTION**
**Count 1**

**Violation of the Freedom of Information Act for Wrongful Withholding of Agency Records – April 8 FOIA**

57. Plaintiff repeats and realleges paragraphs 1-56.

58. Defendants DOC, DOJ, and DHS have wrongfully withheld agency records requested by Plaintiff by failing to disclose records responsive to the April 8 FOIA to Plaintiff.

59. Plaintiff has exhausted the applicable administrative remedies with respect to Defendants' wrongful withholding of the requested records.

60. Plaintiff is entitled to injunctive relief with respect to the release and disclosure of the requested documents.

### Count 2

**Violation of the Freedom of Information Act for Wrongful
Withholding of Agency Records – June 22 FOIA**

61. Plaintiff repeats and realleges paragraphs 1-60.

62. Defendant DOC has wrongfully withheld agency records requested by Plaintiff in its June 22 FOIA by:

   a. failing to comply with the statutory time limit for responding to Plaintiff's initial request and subsequent administrative appeal, and

   b. failing to disclose records responsive to the June 22 FOIA.

63. Plaintiff has exhausted the applicable administrative remedies with respect to Defendant's wrongful withholding of the requested records.

64. Plaintiff is entitled to injunctive relief with respect to the release and disclosure of the requested documents.

**Violation of the Freedom of Information Act for Wrongful Denial of Requests for
"News Media" Treatment and a Waiver of All Processing Fees – June 22 FOIA**

65. Plaintiff repeats and realleges paragraphs 1-64.

66. Defendant DOC has wrongfully denied Plaintiff's requests for treatment as a "news media" requester and for a waiver of all processing fees by failing to comply with the statutory time limit for responding to Plaintiff's requests.

67. Plaintiff has exhausted the applicable administrative remedies with respect to Defendant's wrongful denial of Plaintiff's requests for treatment as a "news media" requester and for a waiver of all processing fees.

68. Plaintiff is entitled to injunctive relief with respect to its requests for "news media" treatment and a waiver of all processing fees.

### Count 3

**Violation of the Freedom of Information Act for Wrongful
Withholding of Agency Records – May 2 FOIA**

69. Plaintiff repeats and realleges paragraphs 1-68.

70. Defendant DOC has wrongfully withheld agency records requested by Plaintiff by failing to comply with the statutory time limit for responding to Plaintiff's FOIA request.

71. Plaintiff has exhausted the applicable administrative remedies with respect to Defendant's wrongful withholding of the requested records.

72. Plaintiff is entitled to injunctive relief with respect to the release and disclosure of the requested documents.

**Violation of the Freedom of Information Act for Wrongful Denial
of Requests for a Waiver of All Processing Fees – May 2 FOIA**

73. Plaintiff repeats and realleges paragraphs 1-72.

74. Defendant DOC has wrongfully denied Plaintiff's request for a waiver of all processing fees by failing to comply with the statutory time limit for responding to Plaintiff's requests.

75. Plaintiff has exhausted the applicable administrative remedies with respect to Defendant's wrongful denial of Plaintiff's requests for a waiver of all processing fees.

76. Plaintiff is entitled to injunctive relief with respect to its requests for a waiver of all processing fees.

### REQUESTED RELIEF

**WHEREFORE**, Plaintiff prays that this Court:

1. Order Defendants DOC, its component NIST, DHS, and DOJ, and its component FBI, to process immediately the requested records in their entirety;

2. Order Defendants DOC, its component NIST, DHS, and DOJ, and its component FBI, upon completion of such processing, to disclose the requested records in their entirety and make copies available to Plaintiff;

3. Order Defendants and their components to grant Plaintiff's requests for treatment

as a "news media" requester and for a waiver of all processing fees;

    4.     Provide for expeditious proceedings in this action;

    5.     Award Plaintiff its costs and reasonable attorneys fees incurred in this action; and

    6.     Grant such other relief as the Court may deem just and proper.

DATED: November 30, 2017                        Respectfully submitted,

                                                  /s/ David L. Sobel
DAVID L. SOBEL
D.C. Bar No. 360418
Electronic Frontier Foundation
5335 Wisconsin Avenue, N.W.
Suite 640
Washington, D.C. 20015
(202) 246-6180

AARON MACKEY
D.C. Bar No. 1017004
CAMILLE FISCHER
(admitted in Maryland)
Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
Attorneys for Plaintiff
ELECTRONIC FRONTIER FOUNDATION